J-S04003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.C.A.W. A MINOR | : | IN THE SUPERIOR COURT |
| | : | OF |
| | : | PENNSYLVANIA |
| APPEAL OF: R.W., FATHER | : | |
| | : | |
| IN THE INTEREST OF: S.W., A MINOR | : | |
| APPEAL OF: R.W., FATHER | : | |
| | : | |
| | : | |
| | : | No. 1969 EDA 2021 |

Appeal from the Decree Entered September 10, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000253-2021,
CP-51-DP-0001289-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: S.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2128 EDA 2021 |

Appeal from the Order Entered September 10, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001289-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: S.C.A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2129 EDA 2021 |

Appeal from the Decree Entered September 10, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000253-2021

| | |
|---|---|
| IN THE INTEREST OF: S.W., A MINOR | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| | : |
| | : |
| | : |
| APPEAL OF: R.W., FATHER | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 764 EDA 2022 |

Appeal from the Order Entered September 10, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001289-2019

| | |
|---|---|
| IN THE INTEREST OF: S.C.A.W., A MINOR | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| | : |
| | : |
| | : |
| APPEAL OF: R.W., FATHER | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 765 EDA 2022 |

Appeal from the Decree Entered September 10, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000253-2021

BEFORE:   BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 6, 2022**

This appeal is now before this Court following a remand to the trial court that allowed counsel for R.W. (Father) to refile Notices of Appeal and Pa.R.A.P. 1925(b) Concise Statements in conjunction with Father's appeal from the decree terminating his parental rights to S.W. (Child), born in July of 2019,

---

* Former Justice specially assigned to the Superior Court.

and from the order changing Child's goal to adoption.[1]  In our memorandum remanding the case,[2] we granted the request to withdraw the two untimely appeals (2128 EDA 2021 and 2129 EDA 2021), which Father's counsel filed to correct the single appeal filing.  Then, in conjunction with the remand of this matter to allow counsel to file separate notices of appeal from the decree and the order, Father's application for non-quashal of the original appeal was essentially granted.  Thus, the appeals identified as 764 EDA 2022 and 765 EDA 2022 are actually the two remaining appeals presently before us, which have been consolidated and are ready to be addressed.[3]

On appeal, Father's brief provides the following questions for our review.

1. Whether the trial court erred and/or abused its discretion when it involuntary [*sic*] terminated Father's parental rights, where such determination was not supported by clear and convincing evidence under the Adoption Act[,] 23 [Pa.C.S. §] 2511(a)?

2. Whether the trial court erred and/or abused its discretion when it involuntarily terminated Father's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the Child under Section 2511(b) of the Adoption Act?

---

[1] The original appeal in which Father had filed a single Notice of Appeal, listing both trial court docket numbers referencing the termination of parental rights decree and the goal change order, is identified at 1969 EDA 2021.

[2] *See In the Interest of: S.C.A.W.*, No. 1969 EDA 2021, unpublished memorandum (Pa. Super. filed March 11, 2022).

[3] *See* Trial Court Opinion (revised), 3/29/2022, at 6.

3. Whether the trial court committed reversible error by granting the Goal Change/Termination petitions at a trial that forced Father to choose between the violation of at least one of two Constitutionally protected rights: his right to be a parent to his child or his right against self-incrimination due to open criminal cases?

Father's brief at 4-5.

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive revised opinion authored by the Honorable Joseph Fernandes of the Court of Common Pleas of Philadelphia County, dated March 29, 2022. We conclude that Judge Fernandes' well-reasoned decision provides an apt discussion of the applicable law and responds to the issues raised by Father.

In particular, Judge Fernandes notes that at the time of the termination/goal change hearing, Child had been in the care of the Philadelphia Department of Human Services (DHS) for approximately 26 months, *i.e.*, since she was less than one month old. The judge also observed that Father had attended two or three visits in November of 2019 before a criminal stay-away order was issued and that Father has not seen Child since that time. Although Father had contact with DHS for a period of time while on house arrest, when he was re-incarcerated in November of 2020, he only had one contact with DHS in the Spring of 2021. Father has had no contact with Child and has no relationship with her. Thus, the court concluded that due to Father's own actions he violated pre-trial probation and was re-incarcerated and has remained incarcerated. Moreover, at the time of the termination/goal change hearing, Father was facing two active criminal cases

- 4 -

and no timeline could be provided as to Father's release from incarceration. Also, before Father testified at the termination/goal change hearing, he was advised of his constitutional rights by the court. Furthermore, Child is happy in her foster placement and looks to her foster parents for all her care. The foster family is open to adoption of Child.

Accordingly, following our review, we conclude that Judge Fernandes' opinion properly disposes of the issues Father raises in this appeal. Thus, we adopt Judge Fernandes' opinion as our own and affirm the decree and order appealed from on that basis.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/6/2022

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

In the Interest of S.C.A.W., a Minor     :     CP-51-DP-0001289-2019
           a/k/a S.W.               :     CP-51-AP-0000253-2021
                                    : 
                                    :     FID:    51-FN-001193-2017
                                    : 
APPEAL OF: R.W., Father          :     764 EDA 2022
                                    :     765 EDA 2022
                                    : 

## OPINION

**Fernandes, J.:**

Appellant R.W. ("Father") appeals from the orders entered on September 10, 2021, granting the petitions filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Father's parental rights to S.W. ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. §2511(a)(2), (5), (8), and (b), and to change Child's permanency goal from reunification to adoption, pursuant to 42 Pa.C.S.A. §6351. Robin Banister, Esquire, counsel for Father ("Father's Counsel"), initially filed a single Notice of Appeal and Statement of Matters Complained of on Appeal bearing both the adoption and dependency docket numbers, on September 26, 2021, resulting in Superior Court EDA 1969 of 2021. Father's Counsel then filed two new Notices of Appeal and Statements of Errors, each with only one docket number, on October 20, 2021, producing Superior Court EDAs 2128 and 2129 of 2021. On October 30, 2021, Father's Counsel filed to withdraw the former two appeals. The Superior Court deferred to the merits panel by Order dated November 16, 2021. On November 6, 2021, Father's Counsel filed an Application for Non-Quashal on the original appeal, which the Superior Court also deferred to the merits panel. On March 11, 2022, the Superior Court merits panel remanded to permitted Father's Counsel a third attempt at filing accurate Notices of Appeal, pursuant to Rule 1925(b), on behalf of Father. Father's Counsel had fourteen days to file such notices. On March 13, 2022, Father's Counsel re-filed the Notices and Statements pursuant to the Superior Court's order.

**Factual and Procedural Background:**

This family has been known to the Philadelphia Department of Human Services ("DHS") since two years prior to this Child's birth. The family became known to DHS on May 10, 2017, when DHS received a General Protective Services ("GPS") report after Mother[1] gave birth to another child, unrelated to this Child's Father. Throughout the process of that investigation and case, DHS learned that Mother suffered from psychotic schizophrenia and had multiple involuntary hospitalizations in multiple states due to her mental health. Mother signed petitions to voluntarily relinquish her parental rights to that child in August 2018, and her rights were terminated on November 6, 2018.

On July 15, 2019, DHS received a GPS report alleging that Mother gave birth to the present Child at Einstein Medical Center on July 12, 2019. The report alleged that Mother tested positive for marijuana, phencyclidine ("PCP"), opioids, and OxyContin on June 20, 2019, upon her admission to the psychiatric unit at Einstein Medical Center, where Mother stayed for five weeks while claiming to be homeless, and where she would return after recovering from the birth of Child. The report further alleged that: Child was in the Neonatal Intensive Care Unit ("NICU") ready for discharge but date was unknown; that Mother did not receive prenatal care during her pregnancy; that Child tested negative for drugs; that Mother was not prepared to care for Child; and that the hospital was waiting for clearance from DHS because Child was ready for discharge. The report continued, alleging: that Mother had substance abuse issues and was diagnosed with psychosis, acute agitation, and schizophrenia; that Mother was taking Haldol, Benadryl, and Ativan; and that Mother stated she has no family supports. Father had visited Mother and stated Mother and Child could live with him. The report was determined to be valid.

On or about July 15, 2019, DHS met with Mother and Father at Einstein Medical Center. Father stated that he and Mother did not live together, and he planned to take Child home with him. Father stated that Paternal Aunt would care for Child while Father was at work, and that Mother was to

---

[1] Mother is not involved in this appeal.

have no unsupervised contact with Child. DHS agreed this plan was appropriate. Child was subsequently discharged from the hospital into Father's care.

DHS made an announced visit to Father's home on July 31, 2019. Child was not present at the home. Father informed DHS that Mother had taken Child from the home and their whereabouts were unknown. Father had planned to find Child independently without involving DHS.

On August 1, 2019, DHS requested that Father file a missing person report. Father refused to file the report. DHS spoke to Child's babysitter that same day. The babysitter stated that she had left Child with Mother between 12 p.m. and 1 p.m. on July 31, and she believed Mother was capable of caring for Child.

On August 2, 2019, DHS received information that Mother and Child were residing in the home of a Family Friend. Upon arrival at the home, DHS located Mother and Child. Mother appeared to be in active psychosis and repeatedly insisted that Child was dead. DHS immediately called for paramedics, who affirmed on arrival that Child was alive and well. Mother also appeared to have no grasp of the time or her location. DHS obtained an Order of Protective Custody ("OPC") and placed Child with Family Friend, where she remained at the time the termination and goal change petitions were filed in May 2021. Child was moved in June 2021, due to a fire below the second-floor apartment of Family Friend. (N.T. 09/10/21, pg. 50).

Mother was involuntarily committed to Thomas Jefferson University Hospital on August 2, 2019, where she still remained as of May 2021, for mental health treatment. DHS performed a Parent Locator Search ("PLS") in May 2021, and found a new address for Mother. (N.T. 09/10/21, pg. 4). The new address was a medical facility in Georgia, so DHS sent the termination petitions to that address as well via UPS overnight mail. (N.T. 09/10/21, pgs.4-5).

At a shelter care hearing[2] on August 5, 2019, the OPC was lifted and the temporary commitment to DHS was ordered to stand. The trial court issued a Stay Away Order against Mother. Child's dependency matter was continued until November 2019.

---

[2] The Honorable Judge Daine Grey Jr. oversaw this matter from August 5, 2019, until April 22, 2020. The Honorable Judge Joseph Fernandes oversaw this matter from August 4, 2020, until present.

On August 27, 2019, Community Umbrella Agency ("CUA") held a Single Case Plan ("SCP") meeting. Father's parental objectives included: making himself available to CUA and complying with services; complying with court orders; maintaining contact with Child through visitation; and attending Child's medical appointments. Father did not participate in the meeting.

Father has a criminal history which includes convictions for witness intimidation, terroristic threats, corruption of minors, possession of an instrument of crime with intent to employ it criminally, and simple assault. He currently has multiple pending criminal cases, including charges of manufacture, delivery, and possession of drugs and firearms, and receiving stolen property. On November 5, 2019, the criminal court issued an order whereby Father was ordered to not have any contact with minor children. This order continues to stand.

On November 6, 2019, the trial court held an adjudicatory hearing for Child, at which time Child's temporary commitment was discharged and Child was adjudicated dependent on the basis of present inability to provide proper parental care and control. Child was fully committed to the custody of DHS. The court found that Father was incarcerated at that time. Father was referred to the Achieving Reunification Center ("ARC") for parenting education programming once released from prison. Father was not permitted any visitation with Child until further order.

The trial court held a permanency review hearing on January 28, 2020. Child's placement continued to be necessary and appropriate, and the court ordered she remain committed and placed. Father did not attend this hearing. Father was again ordered to complete parenting education through ARC and his visitation with Child remained suspended.

On August 4, 2020, the trial court held a permanency review hearing. Child was ordered to remain as committed and placed. No findings were made as to Father at this hearing. On September 11, 2020, the court held another permanency review hearing. Child's placement continued to be necessary and appropriate and she was ordered to remain as committed and placed. Father was ordered to comply with the criminal order that he have no contact with children. If the criminal order was lifted, Father was granted biweekly supervised line-of-sight/line-of-hearing visitation with Child at the agency. Father did not attend this hearing.

On November 25, 2020, Father was arrested again and charged with drug and firearms-related offenses. On January 5, 2021, CUA revised the SCP. Child's alternative/concurrent goal was identified as adoption, and Father's objectives remained predominately the same. Father did not participate in this meeting.

On January 27, 2021, the trial court held another permanency review hearing. The court found that Father was incarcerated at Curran-Fromhold Correctional Facility ("CFCF") and that his visitation was suspended. Upon release, Father was referred for a Parental Capacity Evaluation ("PCE"), and to the Clinical Evaluation Unit ("CEU") for a forthwith drug screen and assessment. Father was ordered to maintain contact with CUA. Father was also referred to ARC again for parenting education and housing assistance programing, for domestic violence and anger management counseling, and ordered to provide CUA information for his criminal matters.

DHS filed termination and goal change petitions for Child on May 5, 2021. The court held a permanency review hearing on May 21, 2021. Father was found minimally compliant with his permanency plan and minimal progress had been made toward alleviating the circumstances necessitating Child's placement. The court noted that Father completed parenting classes in June 2020. Child's commitment and placement stood. Father's visits remained suspended. Father was again ordered to maintain contact with CUA, and upon his release from prison, Father was to be referred for employment and job training, as well as housing assistance, and to the CEU for a forthwith drug screen, assessment, monitoring, and three random screens prior to the next court date. Father was also ordered to be referred for domestic violence and anger management programing again. The next court date was listed for a contested goal change/termination trial.

On September 10, 2021, the trial court held the termination and goal change trial. Father, while incarcerated at the time, was brought down from his facility and was present in the courtroom. The court heard testimony from the CUA Case Manager and Father. The trial court found clear and convincing evidence to involuntarily terminate Father's parental rights to Child pursuant to 23 Pa.C.S.A. §2511(a)(2), (5), (8), and (b), and changed Child's goal to adoption pursuant to 42 Pa.C.S.A. §6351.

As explained previously, Father's Counsel initially filed this appeal on behalf of Father on September 26, 2021, listing both the adoption and dependency trial court docket numbers. Pennsylvania Rule of Appellate Procedure 341 requires that Appellants file separate Notices, one per docket number. Pennsylvania Supreme Court and Pennsylvania Superior Court case law confirm this requirement. *Commonwealth v. Walker*, 185 A.3d 969, 977 (Pa. 2018) (quashing appeal where a single notice of appeal was filed, taken from a goal change order on a dependency docket number and a termination of parental rights order entered on an adoption docket number); *see also, In the Interest of S.D. and L.D.*, ____ A.3d ____, 2021 WL 2521629 (Pa. Super. 2021) (quashing appeal where a single notice of appeal was filed, taken from a goal change order on a dependency docket number and a termination of parental rights order entered on an adoption docket number). The Superior Court issued a Rule to Show Cause asking why the appeal should not be quashed in light of the rule and case law on October 18, 2021. Father's Counsel filed a response on October 20, 2021, and the Superior Court vacated its Rule on October 21, 2021. On October 20, 2021, Father's Counsel re-filed Father's appeal, with two separate Notices and Statements. At this point, the appeal was untimely, filed after the 30 days since the trial court's decision. Father's Counsel did not withdraw the original appeal, resulting in three Superior Court docket numbers at the time of the original opinion, filed October 26, 2021. Father's Counsel filed applications to withdraw the October 20 notices on October 30, 2021. Father's Counsel then filed an Application for Non-Quashal on the initial appeal. The Superior Court deferred both the decision on withdrawal and non-quashal to the merits panel. On March 11, 2022, the Superior Court remanded the matter permitting Father's Counsel to accurately re-file the notices of appeal within fourteen days. On March 13, 2022, Father's Counsel complied with the Superior Court's order.

**Discussion:**

On appeal of the involuntary termination of Father's parental rights and goal change[3], Father asks whether:

---

[3] Father's Counsel filed five Notices of Appeal and Statements of Errors for the September 10, 2021, trial court orders terminating Father's parental rights and changing the goal to adoption. These issues are from the fourth and fifth

1. [T]he trial court erred and/or abused its discretion when it involuntary [sic] terminated Father's parental rights, where such determination was not supported by clear and convincing evidence under the Adoption Act 23 PA.C.S.A. Statute 2511(a)?

2. [T]he trial court erred and/or abused its discretion when it involuntarily terminated Father's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the Child under Statute 2511(b) of the Adoption Act?

3. [T]he trial court committed reversible error by granting the Termination of Parental Rights petition at a trial that forced Father to choose between the violation of at least one of two Constitutionally protected rights: his right to be a parent to his child or his right against self-incrimination due to open criminal cases?[4]

4. [T]he trial court erred and/or abused its discretion when it involuntarily terminated Father's parental rights, where such determination was not supported by clear and convincing evidence under the Juvenile Act, 42 Pa.C.S.A. §6351 and 55 Pa. Code §3130.74, pursuant to the Federal Adoption and Safe Families Act, U.S.C. §671?

The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a), which provides the following grounds for §2511(a)(2):

(a) **General rule** - The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

In proceedings to involuntarily terminate parental rights, the burden of proof is on the party seeking termination, which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994). The clear and convincing

Statements of Error. Father also does not explicitly appeal the goal change, but makes reference to the statute, and so this opinion will address the goal change issue.
[4] This issue was asked on both Statements of Errors.

standard means the evidence "is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-1204 (Pa. 1989). To satisfy Section (a)(2), the moving party must produce clear and convincing evidence of a parent's incapacity to provide for a child's needs that cannot be remedied. A child needs love, protection, guidance, and support. Both physical and emotional needs cannot be met by a merely passive interest in the development of the child. The parental obligation is a positive duty, which requires affirmative performance. It requires continuing interest in the child and a genuine effort to maintain communication and association with the child. This ground for termination is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. *Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996). §2511(a)(2) focuses on the child's present and future need for essential parental care, control, or subsistence necessary for their physical or mental well-being. *In re Adoption of M.J.H.*, 501 A.2d 648, 654 (Pa. Super. 1985). Even if a parent demonstrates love for their child or makes efforts to perform their duties, if a parent's incapacity cannot be remedied, their parental rights may be terminated. *Id.*

In instances where a parent is incarcerated, §2511(a)(2) requires the trial court to focus on the effects of the incarceration on the child, rather than the mere fact of a parent's incarceration. *Id.* Incarceration, while not a litmus test for termination of parental rights, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence to their child. *In re Adoption S.P.*, 47 A.3d 817, 830 (Pa. 2018). Incarceration does not relieve a parent of their obligation to perform their parental duties and a parent must utilize available resources to continue their relationship with a child. *In re J.T.M.*, 193 A.3d 403, 409 (Pa. Super. 2018) (citing *In re Adoption of S.P.*, 47 A.3d at 828). *See also In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). The cause of a parent's incarceration is also relevant to the §2511(a) analysis, where their actions were a factor in support of a child's removal. *In re. Z.P.*, 994 A.2d 1108 (Pa. Super. 2010) (citing *In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) (*en banc*)). Incarceration also does not permit a parent to "wait[] for a more suitable or convenient time to perform one's parental responsibilities while others provide" for the child's needs. *In re B.N.M.*, *supra*. The length of a prison sentence may also be relevant to a trial court's consideration. *In re Adoption of K.J.*, 936 A.2d 1128, 1134 (Pa. Super. 2007) (upholding a termination where a

mother's minimum sentence of eighteen years would prevent rectification of the conditions of incapacity in a timely manner). While incarceration is not a litmus test for termination, it will also not toll a parent's duties toward their child. Further, while "sincere efforts to perform parental duties" may preserve parental rights under §2511(a)(1), the same efforts may be insufficient under (a)(2). *In re Z.P.*, *supra* (citing *In re. Adoption of M.J.H.*, *supra*). A parent does not perform their duties by displaying merely a passive interest in a child's development. *In re B.,N.M.*, 856 A.2d at 855 (Pa. Super. 2004) (citing *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003)). Nor does a parent protect their parental rights by simply stating they wish to retain those rights. *Id.* A parent is not asked to perform the impossible, but a parent must act reasonably and in good faith. *Id.* at 846.

Child was born on July 12, 2019, and has been in DHS care since August 2, 2019. (N.T. 09/10/21, pg. 13; DHS Exhibit 5). At the time of Child's birth, a GPS report was issued from the hospital, due to Mother testing positive for marijuana, PCP, opioids, and oxycodone, and because of concerns for Mother's diagnosis of psychotic schizophrenia. (N.T. 09/10/21, pg. 10; DHS Exhibit 4). Upon DHS investigation of the report, it was determined that Child would be sent home with Father on a safety plan. (N.T. 09/10/21, pg. 10). At the time of the initial DHS investigation, Father claimed Mother was not living with him, he was not in a romantic relationship with Mother, and he was not aware of Mother's mental health problems. (N.T. 09/10/21, pgs. 13-16, 67). Mother claimed she was residing with Father. (N.T. 09/10/21, pgs. 16, 67). Shortly after Child was sent home with Father, DHS visited the home on or about August 2, 2019, to conduct a safety visit, at which point it was discovered that Mother had taken Child and their location was unknown. (N.T. 09/10/21, pgs. 10-11, 65). Father reported that Mother had taken Child while he was at work and that Child was supposed to be in the care of Paternal Aunt. (N.T. 09/10/21, pg. 65). Per the safety plan, Mother was not to have unsupervised contact with Child due to her mental health and substance abuse issues. (N.T. 09/10/21, pg. 11). Child was located at a family friend's house and DHS obtained an OPC. (N.T. 09/10/21, pg. 12; DHS Exhibit 5). DHS obtained an OPC rather than return Child to Father's care due to father's "inability to ensure the [C]hild's safety" and his violation of the safety plan. (N.T. 09/10/21, pg. 13). On September 2019, Father was arrested. (N.T. 09/10/21, pgs. 18, 68-69). Father was released on house arrest, but was reincarcerated in November 2020, and has remained incarcerated since that time. (N.T. 09/10/21, pg. 18). At the time of the termination trial, the CUA Case Manager testified that Father had two active criminal

cases facing trial, and the Case Manager could not provide any timeline for Father's possible release from incarceration. (N.T. 09/10/21, pg. 30). Father's criminal cases involve gun and drug charges, as well as receipt of stolen property, rape, and sexual assault. (DHS Exhibit 7; DHS Exhibit 8). The rape and assault case resulted in a guilty plea to simple assault with other charges withdrawn; however, Father violated his probation and was rearrested. (09/10/21, pgs. 38-39).

Father's Single Case Plan ("SCP") objectives included: maintaining contact with CUA; complete parenting, anger management, and domestic violence programming; attend visits; obtain a parenting capacity evaluation ("PCE"); and obtain a mental health evaluation. (N.T. 09/10/21, pg. 22). Father maintained regular contact with CUA until his re-arrest in November 2020. (N.T. 09/10/21, pg. 23). Father also attended "two or three" visits "around November of 2019", prior to a criminal stay-away[5] order being issued, preventing Father from having contact with minors. (N.T. 09/10/21, pgs. 19-22, 69). The criminal case in which the stay-away order was issued involved charges of rape and sexual assault, with the stay-away order issued November 5, 2019. (DHS Exhibit 7). As of the termination trial date, the sexual assault and rape case was awaiting a Grazier hearing. (DHS Exhibit 7). The stay-away order remained in effect at the time of the termination trial. (N.T. 09/10/21, pgs. 22, 69). The CUA Case Manager testified that when Father attended visits, Father brought Child clothes and gifts, was affectionate with her, and was engaged with Child. (N.T. 09/10/21, pg. 19). Child was an infant at the time of Father's last visit with her in November 2019. (N.T. 09/10/21, pg. 19). After the stay-away order was issued and while Father was on house arrest, Father would provide CUA with gifts and presents for Child, and would "consistently call in to check in and see how [Child] was doing[,]" as well as ask for pictures and updates. (N.T. 09/10/21, pg. 23). However, once Father was re-arrested in November 2020, Father only contacted CUA once in spring of 2021, through Paternal Aunt. (N.T. 09/10/21, pgs. 26-27, 54). Since Father's re-arrest in November 2020, Father has not provided Child with any cards,

---

[5] Where a no-contact or stay-away order has been issued against a parent with respect to a child, the situation is analogous to those encountered by parents serving long prison sentences. *In re A.D.*, 93 A.2d 888, 896-897 (Pa. Super. 2014) (citing *In re Adoption of S.P.*, *supra*). Parental incapacity caused by no-contact orders is relevant to a §2511(a)(2) analysis, and if the order is issued to protect a child from further harm at the hands of the parent, then it is dispositive. *Id.* Despite a parent's inability to directly provide parental care and stability to a child when complying with a no-contact order, a court cannot put a child's needs on hold simply because a parent must abide with the order. *Id.*

letters, or gifts. (N.T. 09/10/21, pg. 40). Father has the CUA Case Manager's contact information. (N.T. 09/10/21, pg. 27). Father completed a parenting program; however, he did not complete his anger management or domestic violence SCP objectives. (N.T. 09/10/21, pg. 28). The CUA Case Manager testified that were Father to be released from incarceration, he would still need to complete his anger management and domestic violence objectives, complete a drug and alcohol assessment and follow any recommendations, and complete a mental health assessment and follow any recommendations. (N.T. 09/10/21, pg. 40).

Father's Counsel called Father as a witness and he provided testimony. (N.T. 09/10/21, pgs. 75-109). Father testified that Mother was residing in his home at the time of Child's birth and he was aware of her mental health diagnoses, despite having said otherwise in the initial DHS investigation. (N.T. 09/10/21, pgs. 78-81, 84-85). Father explained that Mother had "ran off with [Child] somehow when [Paternal Aunt] was there, but [Father] was at work." (N.T. 09/10/21, pg. 84). Father further explained that Mother was "a normal person" when she was taking her medication. (N.T. 09/10/21, pg. 84). Despite being cautioned against such testimony by the trial court, Father also provided his explanation for why he believed all his criminal charges would be dropped. (N.T. 09/10/21, pgs. 95-99, 101-103, 109). Father also alleged that he was not permitted to "make any outreach" to CUA due to being "locked down" while incarcerated, and claimed he wrote three letters to CUA, but provided no proof. (N.T. 09/10/21, pgs. 107-108).

Father was ruled out as a reunification resource for Child due to his inability to complete his SCP and court ordered objectives. (N.T. 09/10/21, pg. 30). The CUA Case Manager also could not testify as to when Father would be able to complete his objectives and put himself in a position for reunification, were he to be released from prison. (N.T. 09/10/21, pg. 32). Child has been in care since she was less than one month old, August 2, 2019. At the time of the termination trial, Child had been in care for approximately 26 months. The CUA Case Manager testified that Father has been unable to form a relationship with Child due to his incarceration. (N.T. 09/10/21, pg. 30). While the visits Father had when Child was an infant, prior to his incarceration, went well, Father has not seen Child since she was only a few months old. Child has been in care the vast majority of her life. Father may demonstrate a desire to retain his parental rights and be a part of Child's life, but a parent does not perform their duties by displaying merely a passive interest in a child's

development, nor do they protect their parental rights by simply stating they wish to retain them. *In re B.,N.M., supra.* As explained previously, the parental obligation is a positive duty, requiring affirmative performance by a parent. Incarceration and stay-away orders may act as barriers to performing parental tasks, but this does not serve as a valid excuse for near complete non-performance of parental duties. Father completed his parenting objective, but has provided no proof that he maintained contact with CUA consistently throughout the life of the case. Father has the CUA Case Manager's contact information. Father completed no other SCP objectives. It is due to Father's own actions of being rearrested that Father is unable to engage and complete his SCP objectives. Father is not being sincere in addressing his parenting duties while he is incarcerated. Father has demonstrated a lack of ability to provide stability for the Child's needs. Father has no foreseeable release date and the conditions with respect to Father that brought Child into care remained at the time of the termination trial, with Father unable to remedy the conditions within the next six months. Child needs permanency. Child has not seen Father since November 2019, when she was less than four-months-old. Child cannot wait for Father to be released from incarceration and wait longer still for Father to put himself in a position to resume his parental responsibilities. Father is unable to provide the essential parental care, control, and subsistence necessary for Child's physical and mental well-being. Termination under 23 Pa.C.S.A. §2511(a)(2) was proper and no error or abuse of discretion occurred.

Father also appeals the trial court's termination of parental rights under 23 Pa.C.S.A. §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond the period of time deemed as reasonable by the legislature or be subjected to herculean efforts. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 505, 509 (Pa. Super. 2001). As a consequence, Pennsylvania's Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster care beyond reasonable temporal limits and

after reasonable efforts for reunification have been made by the agency, which have been ineffective. This process should be completed within eighteen months. *In re N.W.*, 851 A.2d 501, 508 (Pa. Super. 2004).

Child had been in DHS care for approximately 26-months at the time of the termination and goal change trial, since she was less than one-month of age. Father's SCP objectives throughout the life of the case included: maintaining contact with CUA; complete parenting, anger management, and domestic violence programming; attend visits; obtain a parenting capacity evaluation ("PCE"); and obtain a mental health evaluation. (N.T. 09/10/21, pg. 22). Father was aware of his objectives and had the CUA Case Manager's contact information. (N.T. 09/10/21, pg. 27). The only SCP objective Father completed was attending a parenting program. (N.T. 09/10/21, pg. 28). Father did not complete his anger management or domestic violence programming SCP objectives. (N.T. 09/10/21, pg. 28). The CUA Case Manager testified that were Father to be released from incarceration, he would need to complete the anger management and domestic violence programs, complete a drug and alcohol assessment and follow any recommendations, and complete a mental health assessment and follow any recommendations. (N.T. 09/10/21, pg. 40).

Father was briefly compliant with visitation prior to being arrested and a stay-away order being issued in 2019. (N.T. 09/10/21, pgs. 19-23, 69). Father attended "two or three" visits "around November of 2019", prior to the criminal stay-away order's issuance. (N.T. 09/10/21, pgs. 19-22, 69). The CUA Case Manager testified that Father was affectionate and engaged with Child at the visits. (N.T. 09/10/21, pg. 19). Child was an infant at the time of Father's last visit with her in November 2019 and has not seen Father since that time. (N.T. 09/10/21, pg. 19). While Father was on house-arrest, Father would provide CUA was gifts and presents for Child, and would "consistently call in to check in and see how [Child] was doing[,]" as well as ask for pictures and updates. (N.T. 09/10/21, pg. 23). Once Father was re-incarcerated in November 2020, Father only contacted CUA once in the Spring of 2021 and stopped providing cards, letters, or gifts for Child. (N.T. 09/10/21, pgs. 26-27, 40, 54). Father claimed that while incarcerated he was not permitted to "make any outreach" to CUA due to being "locked down", and also claimed that he had written CUA three letters that were returned while he was incarcerated, but was unable to provide evidence of either claim. (N.T. 09/10/21, pgs. 107-108).

The CUA Case Manager testified that she could not say when Father would be able to complete his objectives and put himself in a position to reunify with Child, were he to be released from incarceration immediately. (N.T. 09/10/21, pg. 32). Child has been in care since she was less than one month old, since August 2, 2019, and has not seen Father since she was less than four-months of age in November 2019. At the time of the termination trial, Child had been in care for approximately 26 months. Father has been unable to form any relationship with Child due to his incarceration. (N.T. 09/10/21, pg. 30). Father's incarceration may have presented a barrier to his reunification efforts with Child, but Father still only completed one of several objectives and stopped attempting to provide gifts, cards, and letters to Child. As a result of Father's noncompliance with his SCP objectives, the trial court found that termination of Father's parental rights was in the best interest of Child, for her physical, intellectual, moral, and spiritual well-being. Father is unable or unwilling to remedy the conditions that led to Child's placement and termination best serves Child's needs and welfare. It is Father's own actions that keep him incarcerated. Even when Father was released on house arrest, Father violated his pre-trial probation and was re-incarcerated. Child needs permanency, which Father cannot provide at this time, nor can be provide at a time in the foreseeable future. Because the trial court made this determination on the basis of clear and convincing evidence, termination under 23 Pa.C.S.A. §2511(a)(5) was proper.

The trial court also terminated Father's parental rights under 23 Pa.C.S.A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007). The party seeking termination must prove by clear and convincing evidence

that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love, comfort, security, and stability. *In re Bowman*, 647 A.2d 217, 219 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Child has been in DHS care since August 2, 2019, for approximately 26 months at the time of the termination and goal change trial. At the time of Child's commitment to DHS, Child was less than one-month of age. Throughout he life of the case, Father's SCP objectives included: maintaining contact with CUA; complete parenting, anger management, and domestic violence programming; attend visits; obtain a PCE; obtain a mental health evaluation. (N.T. 09/10/21, pg. 22). Father was aware of his objectives and had the CUA Case Manager's contact information. (N.T. 09/10/21, pg. 27). The only SCP objective Father completed was attending a parenting program. (N.T. 09/10/21, pg. 28). Father did not complete his anger management or domestic violence SCP objectives. (N.T. 09/10/21, pg. 28). The CUA Case Manager testified that were Father to be released from incarceration, he would need to complete the anger management and domestic violence programs, complete a drug and alcohol assessment and follow any recommendations, and complete a mental health assessment and follow any recommendations. (N.T. 09/10/21, pg. 40).

Father was briefly compliant with visitation prior to being arrested and a stay-away order being issued in 2019. (N.T. 09/10/21, pgs. 19-23, 69). Father attended "two or three" visits "around November of 2019", prior to the criminal stay-away order's issuance. (N.T. 09/10/21, pgs. 19-22, 69). The CUA Case Manager testified that Father was affectionate and engaged with Child at the visits. (N.T. 09/10/21, pg. 19). Child was an infant at the time of Father's last visit with her in November 2019 and has not seen Father since that time. (N.T. 09/10/21, pg. 19). While Father was on house-arrest, Father would provide CUA with gifts and presents for Child, and would "consistently call in to check in and see how [Child] was doing[,]" as well as ask for pictures and updates. (N.T. 09/10/21, pg. 23). Once Father was re-incarcerated in November 2020, Father only contacted CUA once in the Spring of 2021 and stopped providing cards, letters, or gifts for Child. (N.T. 09/10/21, pgs. 26-27, 40, 54). Father claimed that while incarcerated he was not permitted to "make any outreach" to CUA due to being "locked down", and also claimed that he had written CUA three letters that were returned while he was incarcerated, but was unable to provide evidence

of either claim. (N.T. 09/10/21, pgs. 107-108). Father has an affirmative duty to overcome any obstacles to parent his Child.

The CUA Case Manager testified that she could not say when Father would be able to complete his objectives and put himself in a position to reunify with Child, were he to be released from incarceration immediately. (N.T. 09/10/21, pg. 32). Child has been in care since she was less than one month old, since August 2, 2019, and has not seen Father since she was less than six-months of age in November 2019. At the time of the termination trial, Child had been in care for approximately 26 months, and the conditions that led to Child's placement remained, despite efforts to assist Father. Father has been unable to form any relationship with Child due to his incarceration. (N.T. 09/10/21, pg. 30). The Child has no identifiable relationship with Father. Child does not know Father. (N.T. 09/10/21, pgs. 31-32, 41, 51-52, 66). Father's incarceration may have presented a barrier to his reunification efforts with Child, but Father still only completed one of several objectives and stopped attempting to provide gifts, cards, and letters to Child. As a result of Father's noncompliance with his SCP objectives, the trial court found that termination of Father's parental rights was in the best interest of Child, for her physical, intellectual, moral, and spiritual well-being. Father is unable or unwilling to remedy the conditions that led to Child's placement and termination best serves Child's needs and welfare. Child needs permanency, which Father cannot provide at this time, nor can be provide at a time in the foreseeable future. Because the trial court made this determination on the basis of clear and convincing evidence, termination under 23 Pa.C.S.A. §2511(a)(8) was proper.

After a finding of any grounds for termination under Section (a), the court must, under 23 Pa.C.S.A. §2511(b), also consider what - if any - bond exists between parent and child. *In re Involuntary Termination of C.W.S.M. and K.A.L.M.,* 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship". *In re Adoption of T.B.B.* 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.,* 946 A.2d 753, 762-763 (Pa. Super. 2008). The trial court must determine that the bond between a parent and a child cannot be in only one direction. There must be a bilateral relationship that roots from a parent's willingness to learn

appropriate parenting skills and ability to provide stability to the child. *In re K.K.R.-S.*, 958 A.2d 529, 534 (Pa. Super. 2008). Additionally, a bond is not just a positive relationship between a child and a parent. Being a parent means assuming responsibility so that a real bond develops, not just a casual relationship. Children have the ability to know, love, and sometimes have an enjoyable time with a parent that have little to do with their upbringing. *In re J.L.C.*, 837 A.2d 1247, 1249 (Pa. Super. 2003). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *Id.* However under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, or medical care, if found to be beyond the control of the parent. The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Father has not seen Child since November 2019. (N.T. 09/10/21, pg. 19). The CUA Case Manager testified that Father attended "two or three" visits "around November of 2019", prior to his arrest and criminal stay-away order being issued. (N.T. 09/10/21, pg. 19-22, 69). The CUA Case Manager also testified that at the visits, Father was affection and engaged with Child. (N.T. 09/10/21, pg. 19). Father brought Child clothes and gifts. (N.T. 09/10/21, pg. 19). However, Father has not seen Child since November 2019, nearly two years ago. (N.T. 09/10/21, pg. 31). When Father was on house arrest, Father would provide CUA with gifts and presents for Child, and would "consistently call in to check in and see how [Child] was doing[,]" as well as ask for pictures and updates. (N.T. 09/10/21, pg. 23). However, once Father was re-incarcerated in November 2020, Father only contacted CUA once in spring of 2021, through Paternal Aunt. (N.T. 09/10/21, pgs. 26-27, 54). Father claimed that while incarcerated, he was not permitted to "make any outreach" to CUA due to being "locked down" and claimed he send three letters that were returned, but provided no evidence of either assertion. (N.T. 09/10/21, pgs. 107-108). The CUA Case Manager explained that Child is very affectionate with her foster parents and looks to them for all her care. (N.T. 09/10/21, pgs. 51-52). Child is happy in her foster placement, and the foster family is open to being a long-term adoptive placement for Child. (N.T. 09/10/21, pgs. 54-56). Child has not known Father as a caregiver, apart from the first few weeks of her life. Child has not seen Father since November 2019, and Father ceased sending gifts, cards, or letters upon his

reincarceration in November 2020. Father has demonstrated an unwillingness and lack of ability to provide stability for the Child. Father keeps getting arrested for his own actions and violation of pre-trial probation. Child does not have any identifiable relationship or bond with Father due to her young age at the time of their last contact. (N.T. 09/10/21, pgs. 31-32, 41, 66). Terminating Father's parental rights would not cause irreparable harm to the child, and adoption is in the best interest of Child. Termination would not destroy an existing, necessary and beneficial relationship between Father and Child as no relationship exists. The trial court's termination of Father's parental rights under 23 Pa.C.S.A. §2511(b) was proper.

Father also asserts that the court erred in changing Child's permanency goal from reunification to adoption. Pursuant to 42 Pa.C.S.A. §6351, when considering a petition to change a dependent child's goal, the trial court must consider, *inter alia*:

> (1) the continuing necessity for and appropriate of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal of the child; (5) a likely date by which the goal might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty two months.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011). In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873, 877 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest Of R.P., a Minor*, 957 A.2d 1205, 1220 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply the instructions received. *In re R.T.*, 778 A.2d 670, 681 (Pa. Super. 2001). A child's life cannot be put on hold in the hope that parent will someday summon the ability to handle and assume the responsibilities of

being a parent. *In re A.B.*, 19 A.3d at 1089. The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Father has been subject to a criminal stay-away order for the majority of the case, since November 5, 2019. (N.T. 09/10/21, pgs. 19-22, 69; DHS Exhibit 7). Father's SCP objectives throughout the life of the case were: maintain contact with CUA; complete parenting, anger management, and domestic violence programming; attend visits; obtain a PCE; obtain a mental health evaluation. (N.T. 09/10/21, pg. 22). Father was aware of his objectives and had the CUA Case Manager's contact information. (N.T. 09/10/21, pg. 27). The only SCP objective Father completed was attending a parenting program. (N.T. 09/10/21, pg. 28). Father did not complete his anger management or domestic violence SCP objectives. (N.T. 09/10/21, pg. 28). The CUA Case Manager testified that were Father to be released from incarceration, he would need to complete the anger management and domestic violence programs, complete a drug and alcohol assessment and follow any recommendations, and complete a mental health assessment and follow any recommendations. (N.T. 09/10/21, pg. 40). Father has not seen Child since November 2019. (N.T. 09/10/21, pg. 19). The CUA Case Manager testified that Father attended "two or three" visits "around November of 2019", prior to his arrest and criminal stay-away order being issued. (N.T. 09/10/21, pg. 19-22, 69). The CUA Case Manager also testified that at the visits, Father was affection and engaged with Child. (N.T. 09/10/21, pg. 19). Father brought Child clothes and gifts. (N.T. 09/10/21, pg. 19). However, Father has not seen Child since November 2019, nearly two years ago. (N.T. 09/10/21, pg. 31). When Father was on house arrest, Father would provide CUA with gifts and presents for Child, and would "consistently call in to check in and see how [Child] was doing[,]" as well as ask for pictures and updates. (N.T. 09/10/21, pg. 23). However, once Father was re-incarcerated in November 2020, Father only contacted CUA once in spring of 2021, through Paternal Aunt. (N.T. 09/10/21, pgs. 26-27, 54). Once re-incarcerated, Father did not make any affirmative actions to show interest in Child. Father has an affirmative duty to overcome any obstacles while incarcerated. There is no reason why he could not write or send cards or request information about Child by consistently communicating with the CUA Case Manager. Rather, Father claimed that while incarcerated, he was not permitted to "make any outreach" to CUA due to being "locked down" and claimed he send three letters that were returned, but provided no evidence of either assertion. (N.T. 09/10/21, pgs. 107-108). Father is currently facing trial on

multiple charges. Even if Father is found not guilty of all criminal charges, reunification with Father would not be immediately viable. The CUA Case Manager testified that she could not say when Father would be able to complete his objectives and put himself in a position to reunify with Child, were he to be released from incarceration immediately. (N.T. 09/10/21, pg. 32). Apart from his parenting objective, Father has completed none of his SCP objectives. Child has been in care since she was less than one-month old. The CUA Case Manager testified that Child has no identifiable relationship with Father, and no bond with Father due to her being an infant at the last visit. (N.T. 09/10/21, pgs. 31-32, 41, 66). The CUA Case Manager explained that Child is very affectionate with her foster parents and looks to them for all her care. (N.T. 09/10/21, pgs. 51-52). Child is happy in her foster placement, and the foster family is open to being a long-term adoptive placement for Child. (N.T. 09/10/21, pgs. 54-56). Given her lack of visits and contact with Father since November 2019 and her age at the time, Child does not know Father. Child has been in DHS custody for 26-months at the time of the termination and goal change trial. Child needs safety and permanency, neither of which Father can provide now or in the immediate future. Child's needs and safety are both consistently met in her current placement with her foster family. Father was noncompliant with his SCP objectives. There is no realistic timeline within which Child and Father could be safely reunified, even upon any potential release from incarceration. It is in Child's best interest to be freed for adoption. The trial court did not err or abuse its discretion when it changed Child's permanency goal from reunification to adoption pursuant to 42 Pa.C.S.A. §6351.

Finally, Father alleges he was "forced [] to choose between the violation of at least one of two Constitutionally protected rights: his right to be a parent to his child or his right against self-incrimination due to open criminal cases[.]" Due process requires adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter. *In re Adoption of J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005); *see also S. Med. Supply Co. v. Myers*, 804 A.2d 1252, 1259 (Pa. Super. 2002). The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Father was not required to testify in the termination/goal change trial, nor was his decision to testify or not dispositive of any issue. Father was present at the trial and chose to testify on his own behalf. (N.T. 09/10/21, pgs. 75-109). Father was instructed by the trial court about his status as a pre-trial defendant and the risks of providing testimony as it may be

used against him. (N.T. 09/10/21. pgs. 98-99). The trial court instructed him to not speak about his criminal charges and the situations regarding those charges. (N.T. 09/10/21. pg. 99). Father declined to follow the trial court's instructions, despite the specifics of Father's criminal cases not being relevant to the termination/goal change issues at hand. Father was not forced to choose between constitutionally protected rights. Indeed, Father was instructed against testifying in such a way that could be self-incriminating, but he decided to ignore the instructions of the trial court and discussed his criminal trials anyway. At the same time, Father was afforded counsel by the trial court since the beginning of this matter. Father's Counsel was allowed to present witnesses and cross-examine all of the DHS witnesses. Father was present in the courtroom and participated in the proceedings. Consequently, the record reflects that Father had an opportunity to be heard at a meaningful time and in a meaningful manner.

**Conclusion:**

For the aforementioned reasons, the trial court found that DHS met its statutory burden by clear and convincing evidence regarding termination of Father's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(2), (5), (8), and (b), and the goal change to adoption pursuant to 42 Pa.C.S.A. §6351. There was also no constitutional violation. The trial court's termination of Father's parental rights and change of goal to adoption was proper and should be affirmed.

By the court.

Joseph Fernandes J.